# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **WILLIAM B. DENTON,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:22cv00039 |
| | ) | **REPORT AND RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] | ) | |
| **Commissioner of** | ) | By:  PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, William B. Denton, ("Denton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Denton protectively filed his application for SSI on June 12, 2020, alleging disability as of June 12, 2020,[2] due to anxiety, depression and residuals from knee and back surgeries. (R. at 18, 262-68, 297.) The claim was denied initially and upon reconsideration. (R. at 105-13.) Denton then requested a hearing before an ALJ. (R. at 116.) The ALJ held a hearing on September 28, 2021, but due to a technological error, no recording of this hearing was made, thereby obligating the ALJ to hold another hearing. (R. at 18, 43-44.) This hearing was held on November 17, 2021, at which Denton was represented by counsel. (R. at 41-75.)

By decision dated January 12, 2022, the ALJ denied Denton's claim. (R. at 18-35.) The ALJ found Denton engaged in substantial gainful activity in the prior three months. (R. at 20.) In particular, he noted Denton's testimony that he began working about a month prior to the hearing and that he worked half a day on Tuesday and eight hours a day the other four days, making $12 per hour. (R. at 20.) The

---

[2] Denton initially alleged January 1, 2019, as his onset date of disability, but counsel later amended it to June 12, 2020. (R. at 64, 262.)

ALJ, thus, found Denton made $432 weekly, or $1,872 monthly,[3] which was above the substantial gainful activity earnings level.  (R. at 20.)  The ALJ also found there was a continuous 12-month period during which Denton did not engage in substantial gainful activity, which his remaining findings addressed. (R. at 21.)  The ALJ found the medical evidence established that Denton had severe impairments, namely substance abuse disorder now in remission with opioid agonist treatment; major depressive disorder; generalized anxiety disorder; attention-deficit/hyperactivity disorder, ("ADHD"); left knee meniscal tear; hepatitis C; and lumbar spine sciatica.  (R. at 21.)  He found that, even with the substance abuse, Denton did not have an impairment or combination of impairments that met or medically equaled an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 21.)  The ALJ found that, including the substance abuse, Denton would have the residual functional capacity to perform sedentary work,[4] with no kneeling, crouching or climbing; no more than occasional stooping or crouching; no public interaction; no more than occasional interaction with others, such as co-workers and supervisors; no fast-paced production demands; no tandem tasks; he had adequate concentration, persistence, maintenance of pace and cognitive ability to perform simple, routine tasks and noncomplex work instructions; and he would be off task more than 15 percent of the time and be absent multiple days monthly.  (R. at 23.)  The ALJ found that Denton could not perform his past relevant work as a

---

[3] The undersigned notes that the appropriate monthly wage would be $1,872, not $1,870. However, for reasons explained herein, this error would not affect the ALJ's finding that Denton engaged in substantial gainful activity.

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties.  Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2022).

Construction Worker II. (R. at 24.) Given Denton's age, education, work experience and residual functional capacity based on all his impairments, including the substance use disorder, and the testimony of a vocational expert, the ALJ found that there were no jobs existing in significant numbers in the national economy he could perform. (R. at 24.)

The ALJ found if Denton stopped the substance use, he still would have a severe impairment or combination of impairments, but he would not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25-27.) The ALJ also found that, if Denton stopped the substance use, he would have the same residual functional capacity as previously stated, minus the off-task and absence limitations, and he still would be unable to perform his past relevant work. (R. at 27, 33.) Based on his age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Denton could perform if he stopped the substance use, including those of a parimutuel ticket checker and a document preparer. (R. at 34.) Because Denton would not be disabled if he stopped the substance use, the ALJ concluded the substance use disorder was a contributing factor material to the determination of disability. (R. at 34.) The ALJ found Denton had not been disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision, and he would not be eligible for benefits. (R. at 34-35.) *See* 20 C.F.R. § 416.935 (2022).

After the ALJ issued his decision, Denton pursued his administrative appeals, (R. at 259-61), but the Appeals Council denied his request for review. (R. at 1-6.) Denton then filed this action seeking review of the ALJ's unfavorable decision,

which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2022). This case is before this court on Denton's motion for summary judgment filed May 26, 2023, and the Commissioner's motion for summary judgment filed June 22, 2023.

## II. Facts

Denton was born in 1983, (R. at 262), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has a high school education and past work as a spray painter. (R. at 46-47.) Denton testified he was living at Oxford House, a sober living facility, and had been working as a helper at ServPro for about a month. (R. at 50-51.) He testified he worked half a day on Tuesdays and eight hours the other four days, earning $12 per hour. (R. at 51.) Denton said he was having difficulty at this job, however, due to sciatica, left knee pain, anxiety and difficulty focusing due to ADHD. (R. at 51-53.) He estimated the heaviest thing he was required to lift/carry at this job was 40 pounds, but he had only had to lift/carry 20 pounds so far. (R. at 51-52.) Denton testified his anxiety caused difficulty being around a lot of people, and he sometimes was around as many as 20 people at this job. (R. at 53.) He also said he sometimes felt like people were staring at him. (R. at 53.) Despite Denton's testimony that his ADHD caused it to be "really hard to pay attention to what I'm doing. …," he denied having difficulty completing assigned tasks. (R. at 53.) According to Denton, he was given no special accommodations on lifting/carrying or any extra breaks at ServPro for his back and knee issues. (R. at 52, 61.) Nonetheless, he testified he had not left work early, come in late or missed work due to physical or mental issues. (R. at 52.) Although Denton stated that, in the prior 10 years, he had been unable to keep a job for a long period of time and that he had lost jobs due to paranoia and "get[ting] into it" with

co-workers, he testified his current employer had no complaints about his interactions with others or his job performance.  (R. at 53-54, 57.)

Denton said, prior to getting this job, he volunteered at a local day shelter as a requirement of living at Oxford House.  (R. at 54.)  He testified he would usually lie down after work for the rest of the evening due to back and knee pain.  (R. at 55.) When he was not working, he said, he spent his time in bed to prevent back and knee pain, and some days he isolated because he did not feel like talking to his roommates. (R. at 55-56.)  Denton stated this occurred three or four days weekly.  (R. at 56.)  He said leaning his neck forward caused electric-like pain in both legs, he had difficulty sitting, standing and walking, and he walked with a limp.  (R. at 52, 56, 61.)  Denton testified his back pain would come and go, depending on his positioning, his right knee pain would come and go, but his left knee pain was constant.  (R. at 60-61.) He stated he was required to perform chores at Oxford House, but when not living there, he had difficulty doing chores and finding the motivation to do them.  (R. at 59.)  He also stated that stress and change caused insomnia.  (R. at 59.)  Denton denied having issues interacting or dealing with people in a store setting.  (R. at 60.)

Denton testified he had been clean and sober for the three months prior, and he stated he had a "better handle on things" since his most recent hospitalization, followed by inpatient treatment and residing at Oxford House.  (R. at 58, 61.)  He testified he also had a period of sobriety of about a year and a half prior to his most recent relapse in August 2021.  (R. at 67.)  During this lengthy period of sobriety, Denton testified he had issues with paranoia, anxiety and depression that interfered with his ability to function and handle day-to-day activities.  (R. at 68-69.) Specifically, he stated he could not get on a regular schedule, being around people "kind of freaked [him] out," and it was "impossible to get [him]self together."  (R.

6

at 69.)  Denton stated he tried to attend two or three AA/NA meetings weekly, which ranged in attendance from two to 30 people.  (R. at 62.)  He also continued to attend weekly group sessions with a psychiatrist, which he did not find difficult to participate in because everyone talked about their own problems.  (R. at 54.)  Denton admitted to continued auditory hallucinations, which had improved, noting he heard voices trying to get him to "get high and stuff" a couple of times weekly.  (R. at 57.)  He denied recent suicidal thoughts, noting the voices telling him to hurt himself had improved since the prior hearing.  (R. at 57.)  Denton's medications, which he said made him sleepy or groggy, included Suboxone, Neurontin, Wellbutrin, Geodon, Trazadone, Seroquel and Robaxin.  (R. at 56, 63-64.)

Sandra Wells-Brown, a vocational expert, was present and testified at Denton's November 2021 hearing.  (R. at 69-74.)  She classified his current work at ServPro as a Construction Worker II, which is unskilled and very heavy,[5] as generally performed.  (R. at 70.)  When asked to consider a hypothetical individual of Denton's age, education and work history, who could perform the sedentary exertional requirements for lifting and carrying, sitting, standing and walking for a full workday with ordinary two-hour breaks; who could not kneel, crouch or climb; who could occasionally stoop and crouch;[6] who had adequate concentration,

---

[5] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more.  If someone can do very heavy work, he also can do heavy, medium, light and sedentary work.  *See* 20 C.F.R. § 416.967(d) (2022).

[6] Although neither party noted that the ALJ found Denton could *both* never crouch *and* occasionally crouch, the undersigned wishes to point out this error.  A review of the record reveals that the hypothetical question posed to the vocational expert contained this same error.  However, I find this error is harmless, in that it does not significantly erode the occupational base for sedentary work, whether it be an ability to never crouch or to occasionally crouch.  Specifically Social Security Ruling, ("S.S.R."), 83-14 states that "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch. …"  1983 WL 31254, at *2 (Jan. 1, 1983).  Additionally, S.S.R. 96-9p states that "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling,

persistence, maintenance of pace and cognition for the performance of simple, routine tasks and noncomplex work instructions; who could have no public interaction; who could have occasional interaction with co-workers and supervisors; and who could perform no work involving tandem tasks or fast-paced production demands, Wells-Brown testified such an individual could perform jobs existing in significant numbers in the national economy, including those of a parimutuel ticket checker and a document preparer. (R. at 70-71.) Wells-Brown also testified that an individual who would be off task 15 percent or more of the workday, or who would be absent, on a consistent basis, more than once monthly, could not sustain gainful work activity. (R. at 74.)

In rendering his decision, the ALJ reviewed records from University of Virginia Health System, ("UVA"); Clearview Center, ("Clearview"); Carilion Clinic; Carilion Roanoke Memorial Hospital, ("Roanoke Memorial"); Carilion Internal Medicine; Carilion Gastroenterology; Carilion Orthopedics; Carilion Velocity Care; Carilion General Surgery; Dr. Michael O'Malley, M.D.; Carilion Behavioral Medicine; Lewis Gale Medical Center, ("Lewis Gale"); Johnston Memorial Hospital; Carilion Clinic Jefferson Psychiatric Behavioral Medicine, ("Jefferson Psychiatric"); National Capital Treatment and Recovery; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Eugene Noland, M.D., a state agency physician; Richard Luck, Ph.D., a state agency psychologist; and Dr. William

---

crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." 1996 WL 374185, at *7 (July 2, 1996).

Rutherford, Jr., M.D., a state agency physician. Denton submitted additional evidence from Ballad Health to the Appeals Council.[7]

On March 24, 2020, Denton saw Dr. Rebecca Dillingham, M.D., via telehealth, at UVA, for an evaluation of hepatitis C. (R. at 376.) Denton stated his belief that he contracted the disease via intravenous drug use, and he reported being on Suboxone treatment for one month at that time. (R. at 376.) He denied abdominal pain and yellowing of the eyes. (R. at 376.) Dr. Dillingham diagnosed chronic hepatitis C without hepatic coma, and she initiated an eight-week course of Mavyret. (R. at 377.)

Denton was transferred to Clearview from the emergency department at Roanoke Memorial on May 8, 2020, after making suicidal statements and exhibiting psychotic behavior. (R. at 399, 464.) He had been referred to the emergency department by behavioral health for delusions and mania. (R. at 399.) Denton reported feeling depressed and anxious after being gang raped in a parking lot. (R. at 399, 460.) However, the treatment records show no medical evidence of such an assault. (R. at 464.) Denton also stated he was "White Jesus," and he was described as very grandiose, irritable and agitated. (R. at 396, 399.) Over the course of his hospitalization, from May 8 to May 20, 2020, Denton received individual, group and recreational therapy and was treated with various medications, including Elavil, Cogentin, Subutex, Wellbutrin, Neurontin, Geodon, Vistaril and Trazodone. (R. at 396-97.) He had no medication side effects, and his symptoms improved. (R. at 397.) At discharge, Denton was alert, oriented and cooperative, with normal speech,

---

[7] The Appeals Council, however, found this evidence – a June 10, 2022, MRI of Denton's lumbar spine – was not relevant to the period before it, and it advised Denton he could file a new SSI application, including this medical evidence, if he wished to do so. (R. at 2, 8-9.)

a euthymic mood and full-range affect; goal-directed and linear thought processes; no suicidal or homicidal ideation, no delusions and no hallucinations; and fair insight and judgment. (R. at 397.) He was diagnosed with delusional disorder and rule out paranoid schizophrenia. (R. at 396.)

When Denton saw Dr. Thomas D. Joseph, M.D., at Jefferson Psychiatric for group therapy on May 26, 2020, he reported doing well and staying sober, and he denied suicidal or homicidal ideations. (R. at 458-59.) Dr. Joseph noted Denton's April 19, 2020, drug screen was positive for amphetamines. (R. at 459.) He diagnosed opiate use disorder, on agonist treatment; and methamphetamine use disorder, in early remission, and he continued Suboxone treatment. (R. at 459.) On June 2, 2020, Denton again reported doing well and staying sober. (R. at 455.) Dr. Joseph noted a May 7, 2020, drug screen, was positive for amphetamines. (R. at 455.) On June 9, 2020, Denton attended group therapy, reporting doing well and staying sober, and denying suicidal and homicidal ideations. (R. at 454.) Over this time, his diagnoses remained unchanged, and he was continued on Suboxone treatment. (R. at 454-55.)

On June 1, 2020, Denton saw Dr. Curtis E. Bower, M.D., at Carilion General Surgery Clinic for an evaluation of an umbilical hernia. (R. at 456.) On examination, Dr. Bower noted an incarcerated umbilical hernia, which he planned to surgically repair. (R. at 458.) Otherwise, Denton's examination findings were normal. (R. at 458.) Dr. Bower indicated he would utilize nonopioid pain medications post-operatively.[8] (R. at 458.)

---

[8] Dr. Bower surgically repaired Denton's umbilical hernia on August 6, 2020. (R. at 846-47.) He prescribed Robaxin. (R. at 847.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on July 7, 2020, finding Denton was mildly limited in his ability to understand, remember or apply information; to interact with others; and to adapt or manage himself; and moderately limited in his ability to concentrate, persist or maintain pace. (R. at 79-80.) He noted Denton's history of severe opiate use, with no clear period of abstinence, as well as a recent hospitalization following delusional statements and psychotic behaviors, but that Denton responded well to medications. (R. at 80.) Leizer stated Denton appeared to have since stabilized, concluding Denton did not clearly have a chronic psychotic disorder, but his behaviors primarily related to his substance abuse. (R. at 80.) He stated Denton demonstrated appropriate thinking and behavior at drug counseling sessions and other medical appointments. (R. at 80.) Leizer concluded that Denton could perform unskilled work if he abstained from drugs. (R. at 80.)

Leizer also completed a mental residual functional capacity assessment of Denton, finding he had no limitation in understanding and memory, social interaction or adaptation, but had moderate limitations in the following areas of concentration and persistence: carrying out detailed instructions; maintaining attention and concentration for extended periods; and completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 83-84.) Leizer opined Denton was not significantly limited in the remainder of areas of concentration and persistence. (R. at 83-84.) He opined Denton was limited in his ability to perform detailed, complex work, as drug cravings and underlying depression likely would result in moderate symptoms. (R. at 84.) However, he opined Denton could perform simple, one- to two-step tasks in

a competitive environment, noting his ability to live independently and care for himself.  (R. at 84.)

Also on July 7, 2020, Dr. Eugene Noland, M.D., a state agency physician, completed a physical residual functional capacity assessment of Denton, finding he could perform medium work,[9] except he could frequently kneel and crouch and occasionally stoop.  (R. at 81-83.)  He found all other postural activities could be performed on an unlimited basis.  (R. at 82.)  Dr. Noland opined Denton had no manipulative, visual, communicative or environmental limitations.  (R. at 82-83.)  He based his findings on Denton's history of knee surgeries, with no current treatment or pain; a reducible hernia, warranting future surgery; and hepatitis C, without severe liver disease.  (R. at 82.)

Denton presented to the emergency department at Roanoke Memorial on July 23, 2020, with complaints of low back pain after falling in the shower two days previously.  (R. at 808-09.)  He reported taking Suboxone as prescribed, without relief.  (R. at 809.)  He also reported redness and swelling of the right elbow, not related to any trauma. (R. at 809.)  Denton denied recent intravenous drug use.  (R. at 809.)  On examination, he was alert and oriented, with normal thought content; he was in acute distress, but had normal musculoskeletal range of motion, no cervical spine tenderness and no deformity; but he had diffuse low back tenderness, including the lumbar spine, thoracic spine tenderness and erythema and swelling to the right elbow.  (R. at 809-10.)  Lumbar x-rays showed no fracture or dislocation.  (R. at 811, 814.)  Denton was diagnosed with acute, bilateral low back pain without sciatica;

---

[9] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can do medium work, he also can do light and sedentary work.  *See* 20 C.F.R. § 416.967(c) (2022).

and cellulitis of the right upper extremity, and he was given Motrin and discharged in stable condition.  (R. at 811-12.)

When Denton saw Dr. Zachary A. Tilley, D.O., at Carilion Internal Medicine Clinic, to establish primary care on August 11, 2020, his main complaint was chronic low back pain with sciatica.  (R. at 835.)  Denton stated he underwent a lumbar discectomy approximately 10 years previously, after which he did well for a while, with some intermittent sciatica.  (R. at 835.)  However, his low back pain was exacerbated after falling in his bathtub about a month previously.  (R. at 835.) Denton stated his pain radiated from the mid-lumbar region down the left leg to about the mid-calf, and he endorsed left leg weakness with numbness and tingling. (R. at 835.)  Denton stated that stretching and Robaxin helped,[10] while sitting worsened his pain.  (R. at 835.)  On examination, he was pleasant and well-groomed, with appropriate attention/concentration; answered questions appropriately; had no musculoskeletal or extremity edema; no musculoskeletal range of motion deficits; good muscle tone; no focal deficits; and positive straight leg raise testing on the left. (R. at 837.)  Dr. Tilley diagnosed chronic low back pain, status-post lumbar discectomy with left-sided sciatica; acute hepatitis C without hepatic coma; major depressive disorder with anxiety; post-traumatic stress disorder, ("PTSD"); bipolar disorder; and opioid addiction treatment with a history of polysubstance abuse.  (R. at 838.)  He referred Denton to a gastroenterologist for hepatitis C, and he prescribed Robaxin.  (R. at 838.)

When Denton presented to Carilion Velocity Care on August 13, 2020, for an ear irrigation, he was alert and fully oriented, with no signs of depression, thought

---

[10] Denton stated he realized Robaxin helped his back pain after it was prescribed following his umbilical hernia repair the prior week.  (R. at 835.)

or mood disorders.  (R. at 833-34.)  During a telephonic post-operative visit on August 21, 2020, Denton reported doing very well, he denied soreness and pain, and he stated he took no narcotics after the hernia surgery.  (R. at 832.)  He stated he worked in construction with his father, but had been out of work for several months due to knee issues and the hernia.  (R. at 832.)  Denton was instructed to follow up as needed.  (R. at 833.)

On September 4, 2020, Denton saw Dr. Marrieth Graciela Rubio, M.D., a gastroenterologist, for evaluation of hepatitis C.  (R. at 827.)  Dr. Rubio noted Denton tested positive for hepatitis C in December 2019, had undergone no prior treatment and had no history of liver disease.  (R. at 827.)  Denton reported a 21-year drug use history, quitting six months previously.  (R. at 827.)  Physical examination was completely normal, including extremities without trauma, cyanosis or edema; normal abdominal findings; and grossly nonfocal neurological findings.  (R. at 829.)  Dr. Rubio diagnosed chronic hepatitis C, unknown genotype; and substance abuse in early remission.  (R. at 829.)  He stated the best course of treatment would be determined once the genotype and disease stage were determined.  (R. at 830.)

On October 12, 2020, Richard Luck, Ph.D., a state agency psychologist, completed another PRTF, finding Denton was moderately limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself.  (R. at 95-96.)  He based his findings on the same reasoning as Leizer had in July 2020, concluding that, with abstinence from drugs, Denton could perform unskilled work.  (R. at 95-96.)  Luck also completed a mental residual functional capacity assessment of Denton, finding he was moderately limited in his ability to understand, remember and carry out

detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to set realistic goals or make plans independently of others. (R. at 99-101.) In all other areas of functioning, Luck found Denton was not significantly limited. (R. at 99-101.) Luck opined Denton was limited to understanding and remembering one- and two-step instructions because, although Denton's memory appeared intact in mental status examinations, he may be overwhelmed by complex instructions due to mental health symptoms. (R. at 99.) Luck also opined Denton was limited in his ability to perform detailed, complex work, as ongoing drug cravings and underlying depression likely would cause moderate symptoms. (R. at 100.) Nonetheless, he concluded Denton could carry out one- and two-step tasks in a competitive environment, noting Denton lived independently and cared for himself. (R. at 100.) Luck also opined that, with continued sobriety, Denton could interact effectively with others in the workplace, as recent mental status examinations showed he was cooperative and pleasant, with a good mood and no hygiene issues, despite Denton's reports of some anxiety without his medications. (R. at 100.) Luck further opined Denton could have occasional interaction with the general public. (R. at 100.) Lastly, Luck opined Denton could perform a job requiring little independent decision making, noting that, despite his heavy reliance on an extended support system, including the Suboxone clinic, group meetings and the Tenant Assistance Program for his housing, he recently had found employment, attended virtual appointments regularly and rode his bike to medical appointments. (R. at 101.)

On October 20, 2020, Dr. William Rutherford, Jr., M.D., a state agency physician, completed a physical residual functional capacity assessment of Denton, finding he could perform light work,[11] except he could frequently push/pull with both lower extremities; frequently climb, kneel, crouch and crawl; occasionally stoop; and his ability to balance was unlimited.  (R. at 97-99.)  Dr. Rutherford imposed no manipulative, visual, communicative or environmental limitations.  (R. at 98.)  He based his findings on recent lumbar x-ray findings showing minimal ventral spondylosis; that, despite Denton's reports of knee and back pain, an August 2020 examination showed no range of motion deficits, good muscle tone, a normal gait and positive straight leg raise testing on the left; bilateral knee examination was unremarkable, except for mild tenderness to palpation of the left knee; Denton's reports of riding a bike to get around and doing body weight exercises, such as push-ups and squats; and that he underwent a hernia repair in August 2020 without complications.  (R. at 98.)

On October 19, 2020, Denton complained to Dr. Tilley of daily left knee pain, not helped by Neurontin, as well as left knee popping and occasional buckling upon walking down stairs.  (R. at 908.)  He stated this pain was worsened by walking and, although Robaxin helped some initially, it did not "now so much."  (R. at 908.)  He denied current drug use, stating his last use had been six months prior to September 2020.  (R. at 910.)  On examination, there was mild tenderness to palpation of the left knee, but findings, otherwise, were normal, including no crepitus, no focal neurological deficits and a normal gait.  (R. at 910.)  Dr. Tilley diagnosed chronic left knee pain, finding a likely mild meniscus injury, referred Denton to orthopedics,

---

[11] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can do light work, he also can do sedentary work.  *See* 20 C.F.R. § 416.967(b) (2022).

ordered left knee x-rays and advised Denton to continue Robaxin as needed.  (R. at 911-12.)

Denton saw Dr. David W. Hartman, M.D., a psychiatrist at Jefferson Psychiatric, from October 20, 2020, to July 20, 2021, for weekly virtual group therapy and medication management.  (R. at 1046-92.)  At the vast majority of these visits, Denton reported he was doing "good," "pretty good," "okay" or "great" and that his sobriety was going "well" or "okay," denying slip ups.  (R. at 1048, 1050, 1052, 1054, 1056, 1058, 1060, 1062, 1068, 1074, 1076, 1078, 1080-81, 1083, 1086-89, 1092, 1108.)  On October 27, 2020, Denton reported he had been sober for the previous six months.  (R. at 1090.)  He was alert and oriented, with a calm and stable mood; had good grooming and hygiene; adequate insight; no paranoia, hallucinations, thoughts of self-harm or current suicidal or homicidal ideations; and he engaged in therapy.  (R. at 1090.)  He appeared to be maintaining stability.  (R. at 1090.)  On November 3, 2020, Denton denied problems, but on November 17, 2020, he reported depression due to the holidays, which caused more urges to use substances.  (R. at 1087, 1089.)  On November 24, 2020, Denton said he had visited his family for a few days and that his dog had passed away, which was difficult.  (R. at 1086.)  In December 2020, he reported he had injured his knee and that he might be doing pain management.  (R. at 1083-84.)  Denton said he had a good Christmas and denied any problems.  (R. at 1082.)  In January 2021, he reported visiting family out of town, and he said he was depressed due to not getting along well with his mother and his father having a stroke.  (R. at 1079-80.)  On February 16, 2021, Denton reported his knee had improved since an infection had cleared, and he was preparing for an upcoming appointment regarding knee surgery.  (R. at 1075.)  In May 2021, Dr. Hartman noted Denton was not working due to knee problems, and they discussed ways to manage his pain after surgery.  (R. at 1064.)  In June 2021,

Denton reported some difficulties focusing, inquiring about ADD medication.  (R. at 1050, 1052.)  On June 24, 2021, he reported lying and watching television for four or five hours due to depression.  (R. at 1050.)  Denton reported anxiety and depression due to his upcoming surgery.  (R. at 1050.)  He felt Wellbutrin and Cymbalta helped some, and Vistaril helped his anxiety a lot, but Seroquel had not been helping much with his sleep.  (R. at 1050.)  Denton said methamphetamine helped him concentrate.  (R. at 1050.)  On mental status examination, he was pleasant and cooperative, with a good mood; coherent and goal-directed speech; no delusions or hallucinations; no suicidal or homicidal ideations; intact sensorium; good short- and long-term memory; and poor judgment and insight.  (R. at 1050.)  Dr. Hartman stated Denton seemed to be doing well.  (R. at 1050.)  On July 6, 2021, Denton stated his mood was starting to stabilize.  (R. at 1048.)  Drug screens on August 11, November 5 and December 14, 2020, as well as January 6, February 25 and June 24, 2021, were clean.  (R. at 1048, 1070, 1080, 1083, 1088, 1092.)  A drug screen on January 29, 2021, was positive for methamphetamine, marijuana, fentanyl and norfentanyl; a screen on April 20, 2021, was positive for norfentanyl; and a June 7, 2021, screen was positive for methamphetamine.  (R. at 1054, 1056, 1074.)  Over this time, Dr. Hartman consistently diagnosed opioid use disorder, on agonist treatment, and he prescribed Suboxone, Wellbutrin, Cymbalta, Neurontin, Vistaril, Geodon and Trazadone.[12]  (R. at 1048-92.)

A November 30, 2020, MRI of the left knee showed a medial meniscus tear with a small associated posterior parameniscal cyst.  (R. at 925.)  It also showed mild quadriceps and patellar tendinosis.  (R. at 925.)

_____

[12] On June 24, 2021, Dr. Hartman also diagnosed methamphetamine use disorder; possible history of depression and anxiety; and ADD, and he increased Denton's Wellbutrin dosage and prescribed Seroquel.  (R. at 1050.)

On December 18, 2020, Denton saw Dr. Michael P. O'Malley, M.D., at Carilion Clinic Orthopaedics, for moderate left knee pain for the prior year, with clicking, locking and episodes of giving way. (R. at 1019.) He was pleasant, appropriate and oriented, with a normal mood and affect. (R. at 1020-21.) Examination of the left knee was notable for zero to 130 degrees of flexion with positive flexion pinch; medial joint line tenderness; palpable, nontender fibular collateral ligament on figure-4 test; an inability to reliably pivot shift, secondary to guarding; and positive McMurray's test[13] with pain, but no click, at the medial joint line. (R. at 1021.) Denton had normal range of motion, stability and neurovascular findings of the right knee, and he had full muscle strength and intact sensation in the L2-S1 nerve distributions. (R. at 1021.) A November 30, 2020, left knee MRI showed a medial meniscus tear, which Dr. O'Malley deemed "quite extensive," and for which Denton elected to undergo an arthroscopic repair. (R. at 1021-22.)

Before Denton could have his knee surgery, however, he developed a methicillin-resistant Staphylococcus aureus, ("MRSA"), infection, requiring a left prepatellar bursa knee incision and drainage on January 28, 2021. (R. at 999.) He continued to receive treatment from Dr. O'Malley for this infection through June 7, 2021, at which time the wound was well-healed. (R. at 949-99.) At that time, Denton had medial joint line tenderness; and positive McMurray's test with pain, and Dr. O'Malley advised the meniscus repair could proceed. (R. at 950.)

During a March 8, 2021, telehealth visit, Dr. Tilley noted Denton continued to see Dr. Hartman for his psychiatric needs and that he also began Mavyret at the end of December for hepatitis C. (R. at 931.) However, after four weeks of the

---

[13] McMurray's test is used to determine the presence of a meniscal tear in the knee. *See* https://www.physio-pedia.com/McMurrays_Test (last visited Jan. 31, 2024).

eight-week course, Denton had to restart the treatment because he missed two weeks. (R. at 931.)  Denton stated Robaxin helped with his chronic low back pain, which Dr. Tilley deemed to be relatively well-controlled.  (R. at 931, 935.)  He advised Denton to continue Suboxone, Robaxin and Neurontin, as well as his hepatitis C treatment with Dr. Rubio.  (R. at 935.)

Denton presented to the Lewis Gale emergency department on July 25, 2021, with complaints of a rash on all extremities and his face, as well as some swelling of the lips.  (R. at 1094.)  He said he took a pill from a friend he thought was Suboxone. (R. at 1094.)  Denton requested detoxification from opiates.  (R. at 1094.)  He was alert, cooperative and oriented, with no focal neurological deficit and normal thought content.  (R. at 1094, 1096.)  He had hives to all the extremities, face and neck, with swelling of the lips.  (R. at 1096.)  Over the course of treatment in the emergency department, the hives resolved, and Denton was medically cleared for psychiatric admission for intermittent suicidal thoughts and opiate withdrawal.  (R. at 1099.) Denton received diagnoses of allergic reaction; opiate abuse, continuous; and suicidal ideation.  (R. at 1100.)  He was hospitalized at Lewis Gale through August 3, 2021, at which time he was awake, alert, relaxed and fully oriented, with an appropriate appearance and an open attitude; mood was "good, a little depressed;" affect was congruent to thought content; he denied suicidal or homicidal ideation, as well as delusions or hallucinations; speech was normal; language was logical and goal-directed; thought process was coherent and goal-directed; associations were intact; short-term memory was intact; attention and concentration were adequate; intelligence was average; judgment and insight were fair; and there were no motor deficits.  (R. at 1104-05.)  Denton was diagnosed with polysubstance (including opioids) dependence with physical dependence; and substance-induced mood

disorder.  (R. at 1105.)  He was discharged with instructions to follow up with Dr. Hartman.  (R. at 1105.)

Denton returned to the Lewis Gale emergency department on August 6, 2021, reporting he had relapsed just one day after his prior discharge.  (R. at 1113.) Specifically, he reported using methamphetamine on two occasions after running into the "old crowd," and a drug screen was positive for methamphetamine and marijuana.  (R. at 1113, 1119.)  Denton was readmitted for recurrent amphetamine abuse and reports of increased depression and suicidal ideation.  (R. at 1142.)  While hospitalized through August 16, 2021, he participated in group and recreational therapy, and social services were provided.  (R. at 1114.)  He reported seeing shadow people who told him to commit suicide for the prior six months, and he had a plan for how he would commit suicide, as well as how he would kill his roommate, who he suspected of stealing his clothes and food.  (R. at 1155.)  On August 12, 2021, he reported using crystal methamphetamine and other narcotics on August 5, 2021, and marijuana on July 29, 2021.  (R. at 1184.)  Prior to this, however, Denton stated he was sober for one and a half years.  (R. at 1186.)  He reported working construction jobs his whole life until eight or nine years previously, when he just stopped showing up.  (R. at 1194.)  Denton stated he had lost five or six jobs due to his substance use disorder.  (R. at 1194.)  He reported serving in the Marines for four years before getting a bad conduct discharge for failing a drug test.  (R. at 1194.)  Denton said he became addicted to pain medications after blowing out his knee.  (R. at 1196.)  He reported a good relationship with his parents.  (R. at 1196.)  Denton was polite, cooperative and grateful during the interview.  (R. at 1197.)  Treatment at a residential treatment center was recommended.  (R. at 1198.)  At discharge on August 16, 2021, Denton was awake, alert and fully oriented, with a normal/euthymic mood;  full range affect; appropriate appearance; relaxed behavior;

open attitude; no suicidal or homicidal ideation; normal speech; simple language; coherent and goal-directed thought process; no loosening of associations; no delusions or hallucinations; intact short- and long-term memory; adequate attention/concentration; average intelligence; fair fund of knowledge; fair insight; and limited/poor judgment. (R. at 1112-13.) He also had a normal musculoskeletal inspection and a normal gait. (R. at 1113.) Denton was diagnosed with polysubstance (including opioids) dependence with physical dependence; and substance-induced mood disorder, and he was discharged to Phoenix House for further inpatient rehabilitation. (R. at 1113, 1116, 1201.)

While at Phoenix House, from August 16 to September 17, 2021, Denton participated in group sessions, individual counseling and virtual NA/AA meetings. (R. at 1358.) On August 19, 2021, he was exhibiting signs of withdrawal, but he participated in group session when prompted. (R. at 1340.) On August 20, 2021, Denton was alert and oriented, with no suicidal or homicidal ideations; normal sleep; good activities of daily living; no behavior issues; congruent affect to mood; normal speech, eye contact, motor activity and thought process; poor insight and judgment; and no mania. (R. at 1332-34.) He reported concentration and memory issues since a recent seven-day blackout, and he said he was not sharing at group sessions because he was nervous "standing up in front of everyone." (R. at 1332-34.) On August 23, 24, 25 and 26, 2021, Denton reported feeling anxious. (R. at 1308, 1314, 1318, 1322.) On August 26, 2021, he was alert and fully oriented, without suicidal or homicidal ideations; good activities of daily living; no behavioral issues; affect congruent to mood; normal speech, eye contact, motor activity and thought process; and no mania; but sleep difficulty; issues with concentration and memory; and poor insight and judgment. (R. at 1309-10.) Denton reported a past diagnosis of "manic depression" with history of rapid cycling, which he described as feeling "super

happy for a couple days." (R. at 1310.)  It was noted that Denton generally presented as calm, despite consistent reports of elevated anxiety and depression, but his range of affect was somewhat limited, and he participated in group and AA meetings, although he reported high anxiety related to sharing in a group setting.  (R. at 1310.) Denton presented as anxious; he made good eye contact; he appeared forthcoming and honest; and his insight into the severity of his use and challenges of recovery was poor.  (R. at 1311.)  On August 27, 2021, Denton reported feeling content.  (R. at 1304.)  On September 1, 2021, it was noted Denton had been pressing to leave treatment.  (R. at 1285.)  At that time, his mental status was the same, except his sleep had improved to normal, he had no cognition/memory issues, and his thoughts had been scattered at times.  (R. at 1284-85.)  The examiner noted limited insight regarding his addiction, but Denton continued to participate in groups and attend AA meetings.  (R. at 1285.)  On September 7, 2021, Denton reported feeling confident. (R. at 1260.)  On September 10, 2021, he reported a recent Covid-19 diagnosis, resulting in increased back pain, which caused increased cravings.  (R. at 1250.)  He was alert and fully oriented, without suicidal or homicidal ideations; no behavior issues; poor memory, as adversely impacted by recent overdose; congruent affect to mood; normal speech, eye contact and thought process; no mania; slowed motor activity; poor insight; and fair judgment.  (R. at 1251-52.)  On September 17, 2021, Denton was discharged from Phoenix House to Oxford House for intensive outpatient treatment.  (R. at 1358.)  His medications at discharge included Suboxone, Neurontin, Wellbutrin XL, Robaxin, Ziprasidone, Trazadone and Seroquel.  (R. at 1359.)

Denton resumed weekly virtual group therapy with Dr. Hartman from September 21 through November 16, 2021.  Over this time, he consistently reported doing "good" and that his sobriety was going well.  (R. at 1361, 1363, 1367, 1369,

1371, 1373, 1375, 1377, 1379.)  On October 12, 2021, Denton said he was looking
for a construction job.  (R. at 1373.)  An October 26, 2021, drug screen was clean.
(R. at 1361.)  On November 2, 2021, he stated he liked the atmosphere at Oxford
House and felt much supported.  (R. at 1367.)  On November 9, 2021, Denton
reported he had not used opioids, and he was working at ServPro, repairing fire and
water damage.  (R. at 1363.)  He also stated he might become a Secretary at Oxford
House, where things continued to go well.  (R. at 1363.)  Denton was alert, oriented,
calm and stable, with good hygiene and grooming; adequate insight; no paranoia,
hallucinations, thoughts of self-harm or current suicidal or homicidal ideations or
actions; and he engaged in therapy.  (R. at 1363.)  A drug screen was clean, except
for Denton's prescribed buprenorphine.  (R. at 1363-64.)  He participated fully in
group discussion and interacted appropriately with other group members, and he was
found to be maintaining stability.  (R. at 1363, 1365.)  Denton was diagnosed with
opioid dependence on maintenance agonist therapy, no symptoms.  (R. at 1365.)  He
consistently denied suicidal and homicidal ideations over this time, and Dr. Hartman
found he was not a danger to himself or others.  (R. at 1361, 1363, 1367, 1369, 1371,
1373, 1375, 1377, 1379.)  Dr. Hartman continued to diagnose opiate use disorder,
on agonist treatment, and he treated him with medications.  (R. at 1361, 1367, 1369,
1371, 1373, 1375, 1377, 1379.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20
C.F.R. § 416.920 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62
(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires
the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a
severe impairment; 3) has an impairment that meets or equals the requirements of a

listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

The Social Security Act precludes a finding of disability "if alcoholism or drug addiction is a material factor to the disability finding." *Delk v. Colvin*, 675 F. App'x 281, 283 (4th Cir. 2017) (citation omitted); 42 U.S.C. § 423(d)(2)(C). The regulations implementing this provision "specify that alcoholism or drug addiction is a [material] contributing factor … if an individual would not be disabled if he stopped using alcohol or drugs." *Mitchell v. Comm'r of the Soc. Sec. Admin.*, 182 F.3d 272, 274 n.2 (4th Cir. 1999) (citation omitted). Accordingly, when an ALJ finds a claimant disabled and also finds evidence of substance abuse, he must determine whether the disability would exist in the absence of substance abuse. *See Delk*, 675 F. App'x at 283 (citation omitted); *see also* 20 C.F.R. § 416.935(b)(1) (2022). If a claimant no longer would be disabled absent substance abuse, then the substance abuse constitutes a material contributing factor, thereby precluding a finding of

disability.  *See Delk*, 675 F. App'x at 283; *see also* 20 C.F.R. § 416.935(b)(2)(i) (2022); 42 U.S.C. § 1382c(a)(3)(J).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997.)

Denton argues the ALJ erred by finding he engaged in substantial gainful activity since October 2021.  (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 17-18.)  Denton also argues the ALJ erred in his assessment of Denton's physical impairments and resulting physical residual functional capacity finding by failing to perform a function-by-function analysis and failing to properly assess his allegations of pain and fatigue on his work-related functioning.  (Plaintiff's Brief at 18-21, 29-32.)  Lastly, Denton argues the ALJ's assessment of his mental impairments is not supported by substantial evidence because he failed to build an accurate and logical bridge between the evidence and his mental residual functional capacity findings.  (Plaintiff's Brief at 22-29.)

For the following reasons, I find substantial evidence supports the ALJ's finding that Denton engaged in substantial gainful activity since October 2021.  The regulations define substantial gainful activity as "work activity that is both

substantial and gainful."  20 C.F.R. § 416.972 (2022).  Work is "substantial" if it
"involves doing significant physical or mental activities."  20 C.F.R. § 416.972(a)
(2022).  It is "gainful" if it is "work activity that you do for pay or profit."  20 C.F.R.
§ 416.972(b) (2022).  Under the regulations, earnings derived from work activity
generally is the primary consideration in determining whether a claimant is engaged
in substantial gainful activity.  *See* 20 C.F.R. § 416.974(a)(1) (2022).  If a claimant's
earnings exceed guidelines set forth in the regulations, a presumption arises that the
claimant engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.974(b)(2)
(2022); *Payne v. Sullivan*, 946 F.2d 1081, 1083 (4th Cir. 1991).  However, this
presumption of substantial gainful activity "may be rebutted," and "is not to be
rigidly applied."  *Payne*, 946 F.2d at 1083.

Here, Denton testified at the November 2021 hearing that he had been
working a job at ServPro, repairing fire and water damage, for about a month.
According to Programs Operating Manual System, ("POMS"), DI 10501.015,
Tables of SGA Earnings Guidelines and Effective Dates Based on Year of Work
Activity, if Denton earned $1,310 monthly in 2021, then he was, presumptively,
performing            substantial            gainful            activity.            *See*
https://policy.ssa.gov/poms.nsf/lnx/0410501015 (effective Oct. 18, 2023).  Here, as
the ALJ stated, Denton's own testimony established he was working 36 hours
weekly at a pay rate of $12.00 per hour, which would translate to $432.00 weekly
and $1,872.00 monthly.  Thus, by Denton's own testimony, he presumptively was
performing substantial gainful activity by approximately mid-October 2021.  The
only argument Denton advances in opposition to such a finding is that it is not
supported by substantial evidence because his employment had lasted less than six
months.  Denton cites to 20 C.F.R. § 416.974(c) in support of this argument.  I am
not persuaded.

According to 20 C.F.R. § 416.974(c)(1), "Ordinarily, work you have done will not show that you are able to do substantial gainful activity if, after working for a period of 6 months or less, you were forced by your impairment to stop working or to reduce the amount of work you do so that your earnings from such work fall below the substantial gainful earnings level … and you meet the [other conditions in] this section."  Title 20 C.F.R. § 416.974(c)(3), which relates to periods of employment lasting six months or less, provides, "We will consider work of 6 months or less to be an unsuccessful work attempt if you stopped working or you reduced your work and earnings below the substantial gainful activity earnings level because of your impairment or because of the removal of special conditions that took into account your impairment and permitted you to work."  Here, Denton bears the burden at step one of the sequential evaluation process to show that he did not engage in substantial gainful activity.  *See Lawson v. Colvin*, 21 F. Supp. 3d 606, 609-10 (W.D. Va. 2014). He has failed to meet that burden.  For instance, he has not shown that his impairments forced him to stop working or reduce the amount of work so his earnings fell below the presumptive substantial gainful earnings level.  He also has not alleged the removal of any special conditions of employment that required him to stop working or reduce his work below the substantial gainful earnings level.  In fact, Denton testified, specifically, that his employer made no special accommodations for him, he could finish the tasks assigned to him, he denied the existence of any complaints by his employer about his job performance, and he denied ever having to arrive late, leave early or miss work due to a physical or mental impairment.  Lastly, Denton did not raise this issue until he appealed to this court, and he has advised neither the Appeals Council nor this court that he no longer works at ServPro.

For all these reasons, I find that substantial evidence supports the ALJ's finding that Denton was performing substantial gainful activity beginning in mid-October 2021 through the date of the decision. That being the case, I further find that substantial evidence supports the ALJ's finding that Denton was not disabled during this time.

Denton also argues that the ALJ erred in his assessment of physical impairments and resulting physical residual functional capacity finding and that his assessment of Denton's subjective allegations is not supported by substantial evidence. Again, I disagree. The ALJ found that, for the period from June 12, 2020, to mid-October 2021, the medical evidence established that, if Denton stopped using substances, he could perform sedentary work that required no kneeling, crouching or climbing and no more than occasional stooping or crouching. (R. at 23.) Denton argues the ALJ failed to conduct the appropriate function-by-function analysis in determining his residual functional capacity, in that he failed to make specific findings as to whether his medically determinable impairments would cause pain and fatigue, resulting in an inability to maintain a static work posture or the need to lie down during the day or abandon tasks.

In assessing a claimant's residual functional capacity, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the residual functional capacity may be stated "in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Social Security Ruling, ("S.S.R."), 96-8p, 1996 WL 374184, at *1 (July 2, 1996)); *see also Monroe v. Colvin*, 826 F.3d 176, 188-89 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the

evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted). In *Mascio* and *Monroe*, the court remanded because the ALJ failed to adequately explain how he arrived at conclusions regarding the claimant's residual functional capacity. *See Mascio*, 780 F.3d at 636; *Monroe*, 826 F.3d at 189. The ALJ's residual functional capacity assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in his residual functional capacity finding. *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p, 1996 WL 374184, at *7). As stated above, Denton asserts the ALJ failed to perform a proper function-by-function analysis of whether his impairments caused pain and fatigue that would limit his work-related functioning. Based on my review of the record, I find that Denton's argument fails.

First, *Mascio* does not set out "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." 780 F.3d at 636. Instead, remand should be considered "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). Thus, Denton cannot claim error simply because the ALJ did not explicitly set forth a detailed analysis for each of Denton's functional abilities, as long as the ALJ's conclusions are ascertainable from his narrative discussion and supported by the record.

In this case, it is clear from the ALJ's decision that he considered all the evidence pertaining to Denton's allegations of pain and fatigue. Specifically, the

ALJ noted the following relevant testimony by Denton: that he had a history of back and knee issues, including surgeries; that he had difficulty using stairs; that he had a limp; that he could walk for only 10 minutes; that he had difficulty in his work at ServPro due to his back and left knee problems; that he would lie down after work due to his back and knee problems; and that his hepatitis C was in remission. (R. at 27-28.) The ALJ also noted the medical evidence relevant to pain and fatigue. In particular, he noted Denton's July 2020 emergency department visit for low back pain after falling in the shower, and in August 2020, when establishing care with a primary care provider, the main issue he wanted to address was chronic back pain with sciatica. (R. at 29.) The ALJ noted Denton's August 6, 2020, hernia repair and that he was doing "really well" at an August 21 follow up. (R. at 29.) Denton complained of left knee pain to his primary care provider on October 19, 2020, for which he saw an orthopedic provider on December 18, 2020. (R. at 29-30.) In June 2021, he reported lying around and watching television four to five hours due to depression. (R. at 30.)

Despite Denton's allegations of pain and fatigue, the ALJ also noted the record evidence supporting his ultimate residual functional capacity finding. For instance, in August 2021, Denton informed substance abuse recovery providers he had left previous construction jobs due to substance abuse, not physical issues. (R. at 33.) In April 2020 he reported walking everywhere, but his only complaint was of heel pain. (R. at 33.) In July 2020, a lumbar spine x-ray showed only minimal spondylosis and, although Denton had a positive straight leg raise test in August 2020, the record does not include much regarding Denton's back after that time. (R. at 33.) In October 2020, there was mild left knee tenderness, but no crepitus. (R. at 33.) A November 2020 MRI showed a left knee meniscal tear; and in December 2020, Denton had a positive McMurray's test, and surgical repair of the meniscus

was planned.  (R. at 33.)  Nonetheless, the ALJ noted Denton had a normal gait at that time and at later orthopedic visits.  (R. at 33.)  In late 2021, Denton began a job in which, according to Denton, he received no accommodations, and he had lifted up to 20 pounds, but could be expected to lift up to 40 pounds.  (R. at 33.)  Additionally, the ALJ noted Denton's hepatitis C diagnosis, but that he complained of no associated symptoms.  (R. at 33.)  In particular, Denton denied abdominal pain in March 2020, and at a gastroenterology appointment in September 2020, the review of symptoms was negative for physical issues.  (R. at 33.)  The ALJ concluded that the sedentary exertional level accommodated some fatigue Denton may have from his hepatitis C.  (R. at 33.)

Regarding Denton's argument that he ALJ erred in analyzing his subjective allegations, the Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 416.929 and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.  *See Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020).  First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms.  *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996).  Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled.  *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 595.  Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements regarding the intensity, persistence, and limiting effects of symptoms solely because the objective

medical evidence does not substantiate" them.  S.S.R. 16-3p, 2017 WL 5180304, at
*5; *see also* 20 C.F.R. § 416.929(c)(2); *Craig*, 76 F.3d at 595.  In other words, "while
there must be objective medical evidence of some condition that could reasonably
produce the pain, there need not be objective evidence of the pain itself or its
intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d
at 592-93.  However, the Fourth Circuit has held that objective medical evidence and
other objective evidence are "crucial" in evaluating the second prong of the symptom
analysis test.  *Craig*, 76 F.3d at 595.  In *Craig*, the Fourth Circuit stated, "[a]lthough
a claimant's allegations about [his] pain may not be discredited solely because they
are not substantiated by objective evidence of the pain itself or its severity, they need
not be accepted to the extent they are inconsistent with the available evidence,
including objective evidence of the underlying impairment, and the extent to which
that impairment can reasonably be expected to cause the pain the claimant alleges
[he] suffers."  76 F.3d at 595.  Specifically, the ALJ must consider "any
inconsistencies in the evidence and the extent to which there are any conflicts
between [the claimant's] statements and the rest of the evidence, including [his
medical] history, the medical signs and laboratory findings, and statements by [his]
medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R.
§ 416.929(c)(4) (2022).  The regulations direct that a claimant's "symptoms,
including pain, will be determined to diminish [his] capacity for basic work activities
to the extent that [his] alleged functional limitations and restrictions due to
symptoms, such as pain, can reasonably be accepted as consistent with the objective
medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4).

Here, the ALJ explicitly set out this two-step framework in his decision.  (R.
at 23-24.)  Importantly, the ALJ also stated as follows, "… whenever statements
about the intensity, persistence, or functionally limiting effects of pain or other

symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." (R. at 24.)  After a thorough recitation of Denton's allegations and the medical evidence of record, the ALJ stated, "… the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 31.)  Thus, the ALJ appropriately followed the regulations and the Fourth Circuit's holding in *Craig* that there need not be objective evidence of the pain itself or its intensity, but a claimant's subjective allegations need not be accepted "to the extent they are inconsistent with the … objective evidence of the underlying impairment. …"  76 F.3d at 595; *see also* 20 C.F.R. § 416.929(c)(4).  For these reasons, I find Denton's argument the ALJ erred by requiring him to show his pain and fatigue by objective evidence fails.

Moreover, contrary to Denton's argument, and based on the evidence cited above, I also find that the ALJ's conclusions are ascertainable from his narrative discussion and supported by the record and, therefore, meaningful review of the ALJ's decision by this court is not frustrated.  Thus, I find remand under *Mascio* is not appropriate, and the ALJ's physical residual functional capacity finding is supported by substantial evidence of record.

Lastly, Denton argues the ALJ erred by failing to build an accurate and logical bridge between the evidence and his mental residual functional capacity findings.  I also am not persuaded by this argument.  In determining a claimant's residual functional capacity, an ALJ must *both* identify evidence that supports his conclusion *and* "build an accurate and logical bridge from [that] evidence to his conclusion."

*Monroe*, 826 F.3d at 189 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)) (internal quotation marks omitted).  Here, the ALJ concluded that, if Denton stopped substance use, he could perform simple, routine tasks and noncomplex work instructions; he could have no interaction with the public, but occasional interaction with others, such as co-workers and supervisors; he could not perform any fast-paced production demand work; and he could not perform work involving tandem tasks. (R. at 27.) In arriving at this conclusion, the ALJ thoroughly summarized Denton's mental health allegations, as well as the record evidence.  Specifically, he noted the following mental health allegations/testimony of Denton: he has a history of suicidal ideation, but had not been having suicidal thoughts lately; he had not missed work due to mental issues; he has social anxiety at work; he is around up to 20 people at work sometimes; he sometimes feels like people are staring at him; he has ADD and struggles not to lose his train of thought; he was not having difficulty with his work tasks; he attends all substance abuse group sessions, consisting of two to 30 people, without much difficulty because everyone talks about their problems; his auditory hallucinations had improved, and he heard voices a couple of days weekly; he had previously lost jobs due to paranoia and conflict with co-workers; he had trouble following the necessary steps in his past volunteer work and in his current work due to depression and anxiety; he felt he had better control of his substance abuse after undergoing treatment; his past relapses were attempts at self-medication; he has issues coping with stress, he cannot handle spur of the moment changes, and he has periods of insomnia associated with life changes; he said he liked his work at ServPro, partly because he has a different situation every day; he was entirely sober over a year and a half before his Lewis Gale hospitalization, during which time he had paranoia and anxiety; and he had sleep issues and difficulty being around others, noting he could not get a pattern to his schedule or get himself together.  (R. at 27-28.)

In assessing the severity of Denton's mental impairments, the ALJ found Denton was moderately limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 26.) The ALJ listed specific record evidence to support these findings. For instance, Denton did not have significant cognitive abnormalities in examinations, aside from the substance abuse hospitalizations in May 2020 and August 2021, and he had linear and goal-directed thought processes when he was discharged in May 2020. In June 2021, Denton was coherent and goal-directed, and his memory was good, and this same provider noted no cognitive issues in other visits. When Denton was discharged from the hospital in August 2021, he had coherent thought processes and intact memory. In November 2021, a counselor noted Denton demonstrated adequate insight. However, due to Denton's report of some anxiety and depression issues, the ALJ stated he could have difficulty with complex tasks. Thus, the ALJ found the limitation to simple, routine tasks and noncomplex work instructions would accommodate Denton's issues in understanding, remembering or applying information. Regarding interactions with others, the ALJ noted Denton's reports of feeling like people sometimes stared at him at work, but he indicated no panic attacks from this. Denton also reported no social anxiety issues related to his work at ServPro at a November 2021 counseling appointment. Although he testified he sometimes would isolate upon arriving home to Oxford House, he reported no difficulty there in November 2021. In fact, Denton stated things were going well, and he might become a secretary of his Oxford House. In June 2021, he reported some anxiety and depression, but he did not complain of social anxiety, and he said he enjoyed going online and chatting with friends. Lastly, Denton's work at ServPro involved being around up to 20 people, including a supervisor. Thus, the ALJ found the evidence indicated Denton could occasionally interact with co-workers and supervisors.

Regarding concentrating, persisting and maintaining pace, the ALJ found that providers generally did not note any concentration abnormalities, aside from the substance abuse hospitalizations in May 2020 and August 2021, and when Denton established primary care in August 2020, concentration was appropriate. His regular mental health provider also noted no concentration issues, and in the latter part of his August 2021 hospitalization, Denton's concentration was adequate. Although Denton reported some depression and anxiety in June 2021, he said he was doing "pretty good," and no concentration issues were noted on examination. The ALJ found the prohibition on fast-paced production demands would prevent Denton from experiencing exacerbated psychological issues, and the limitation to simple tasks and noncomplex instructions would allow him to maintain concentration without significant off-task time, as such tasks would not require much thinking or focus. Lastly, regarding adapting or managing himself, the ALJ noted Denton had suicidal ideation in April and May 2020, as well as August 2021, but the record indicated he was using drugs during those times. He also had suicidal ideation in July, but he was going through opioid withdrawal. Denton denied suicidal ideation in regular mental health visits, as well as in November 2021. Although Denton testified to anxiety, he did not report panic attacks. He did have delusions, including a roommate trying to kill him, but this occurred during acute drug use episodes. Otherwise, the record did not indicate substantial anxiety issues. The ALJ noted Denton reported doing well in regular mental health visits, and he denied suicidal ideation in November 2021. Lastly, the ALJ noted Denton had been able to work consistently for a month at the time of the decision. For these reasons, he found the prohibition on production rate work and the limitation to simple tasks would prevent Denton from becoming overwhelmed. (R. at 27.)

In discussing the medical records, the ALJ noted that on August 11, 2020, Denton had appropriate concentration, answered questions appropriately and had a pleasant affect.  (R. at 29.)   On September 4, 2020, he indicated anxiety and depression on a review of symptoms.  (R. at 29.)  On November 17, 2020, Denton reported depression due to the holidays, resulting in an increased urge to use.  (R. at 29-30.)  However, he stated he was doing "good," and his sobriety was "okay."  (R. at 29.)  A November 5, 2020, drug screen was clean.  (R. at 30.)  On December 15, 2020, he reported no suicidal ideations, and he stated he was doing "okay."  (R. at 30.)  On December 18, 2020, Denton had a normal mood.  (R. at 30.)  On May 4, 2021, he told a mental health provider he was not working due to his knee problems.  (R. at 30.)   On June 24, 2021, Denton reported some continuing anxiety and depression, resulting in him lying around watching television for four to five hours, and thinking about an upcoming knee surgery also caused anxiety and depression.  (R. at 30.)  He stated Wellbutrin and Cymbalta were helping some, Seroquel helped him sleep, and Vistaril helped his anxiety "a lot."  (R. at 30.)  Denton was pleasant, cooperative, coherent and goal-directed, with no delusions and a good mood, and his short- and long-term memory were good.  (R. at 30.)  A June 7, 2021, drug screen was positive for methamphetamine, which Denton said helped him concentrate.  (R. at 30.)  He was hospitalized on July 25, 2021, for suicidal thoughts and opiate withdrawal.  (R. at 30.)

On August 3, 2021, Denton's mental status examination was unremarkable, including coherent thoughts, adequate concentration and a mood that was "a little" depressed.  (R. at 30.)  He was, again, hospitalized on August 6, 2021, for suicidal ideation and drug detoxification.  (R. at 30.)  During his hospitalization, he endorsed hallucinations, he had slowed speech, simple language and limited/poor concentration.  (R. at 30.)  Denton said he wanted to kill his roommate because his

roommate had attacked him, and he admitted to seeing shadow people who told him to commit suicide for the previous six months.  (R. at 30-31.)  By August 13, 2021, Denton denied hallucinations and suicidal ideation.  (R. at 31.)  He was discharged on August 16, 2021, with a euthymic mood, coherent thought process, intact memory and adequate concentration.  (R. at 31.)  He was diagnosed with polysubstance dependence and substance-induced mood disorder.  (R. at 31.)  The same day, when Denton entered a substance abuse recovery program, he reported he had not worked in eight to nine years due to substance use disorder, and he had walked away from five construction jobs because of his substance use disorder.  (R. at 31.)  On October 12, 2021, Denton told his mental health provider he was doing "good," and he was looking into getting a construction job.  (R. at 31.)  On November 19, 2021, he reported he had not been using opioids, and he was doing well. (R. at 31.)  His job at ServPro and things at Oxford House were going well.  (R. at 31.)  Denton stated he might even become secretary there.  (R. at 31.)  At that time, Denton had good grooming and hygiene, a calm and stable mood, and he denied paranoia, hallucinations and suicidal thinking.  (R. at 31.)

After considering the allegations and the record evidence, the ALJ concluded that Denton's hallucinations, delusions and suicidal ideation coincided with his substance use.  Conversely, the ALJ noted that, during periods of sobriety, Denton's mental status examinations largely were unremarkable, he stated he was doing well, and he even had kept a job for approximately one month at the time of the hearing without any special accommodations and without missing any work due to mental health symptoms.  The ALJ further found the evidence did not indicate concentration difficulties when Denton was not using illegal substances.  (R. at 32.)  Further, despite Denton's allegations of paranoia and anxiety, even during sober periods, the record indicated only some, but not great, depression and anxiety.  (R. at 32.)

Specifically, the ALJ stated Denton did not complain of mood abnormalities at mental health visits and, in June 2021, he reported that medication helped his anxiety "a lot." (R. at 32.) In June 2021, Denton was deemed to be doing well, with a good mood, and in November 2021, he was calm and stable and denied paranoia. (R. at 32.) The ALJ concluded that, despite Denton's anxiety and depression, he could maintain concentration for simple tasks. (R. at 32.) Moreover, the ALJ noted that, despite Denton's report of not sharing at group meetings due to being nervous standing in front of everyone, he did not testify to being particularly uncomfortable in group sessions, indicating he had adjusted to them. (R. at 32.) Additionally, despite Denton's testimony of nervousness around others at work sometimes, he did not allege panic attacks, and he had continued to work. (R. at 32.) Thus, the ALJ concluded Denton could occasionally work with co-workers and supervisors. (R. at 32.) The ALJ further noted that, aside from a few emergency room visits, the records did not, generally, show psychological abnormalities when meeting with his regular mental health provider. (R. at 33.) Likewise, providers for Denton's physical issues did not note any mental issues. (R. at 33.) Based on all this evidence, the ALJ found the opinions of the state agency psychologists, who opined Denton's behavior issues primarily were related to substance use, and who limited him to one- to two-step tasks, occasional public interaction and little independent decision making, were persuasive. (R. at 33.)

After reviewing the record, it is apparent that the ALJ appropriately considered all the evidence relevant to Denton's mental health issues in making his mental residual functional capacity determination. It further is apparent that the ALJ methodically built the requisite accurate and logical bridge from that evidence to his ultimate mental residual functional capacity determination, as he supported his findings with specific evidence in the record, thereby allowing for a meaningful

review by this court.  In that vein, I further find that, based on the evidence cited above, substantial evidence supports the ALJ's mental residual functional capacity determination.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's finding that Denton was performing substantial gainful activity from mid-October 2021 through the date of the decision;

2.  Substantial evidence exists in the record to support the ALJ's finding that Denton's drug addiction was a contributing factor material to his disability;

3.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding, absent Denton's drug addiction; and

4.  Substantial evidence exists in the record to support the Commissioner's finding that Denton was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Denton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    February 1, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE